FILED
United States Court of Appeals
Tenth Circuit

July 20, 2026

Christopher M. Wolpert
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

JEFFREY SCOTT SMITH, JR.,

     Defendant - Appellant.

No. 25-7019

_____

**Appeal from the United States District Court
for the Eastern District of Oklahoma
(D.C. No. 6:23-CR-00139-JFH-1)**

_____

Erick L. Guzman, Law Office of Erick L. Guzman, Santa Rosa, California, for Defendant-Appellant.

Christopher C. Wang, Attorney, Department of Justice, Washington, D.C. (Christopher J. Wilson, United States Attorney, and Linda A. Epperly, Appellate Chief, United States Attorney's Office, Muskogee, Oklahoma; and Harmeet K. Dhillon, Assistant Attorney General, Jesus A. Osete, Principal Deputy Assistant Attorney General, and David N. Goldman, Attorney, Department of Justice, Washington, D.C., with him on the brief) for Plaintiff-Appellee.

_____

Before **PHILLIPS**, **McHUGH**, and **MORITZ**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

During his first solo shift as a police officer in Savanna, Oklahoma, Defendant-Appellant Jeffrey Scott Smith, Jr., pulled over a vehicle for a traffic

violation, activating his body camera and dashboard camera to record the stop. Several minutes later, he manually deactivated both cameras and ordered the nineteen-year-old passenger from the stopped vehicle to go sit in his patrol vehicle, where he sexually assaulted her.

A jury convicted Mr. Smith on one count of deprivation of rights under color of law, in violation of 18 U.S.C. §§ 242 and 250(b)(3), and two counts of falsifying records, in violation of 18 U.S.C. § 1519. The district court sentenced Mr. Smith to concurrent sentences of 480 months on the § 242 count and 240 months on the § 1519 counts.

On appeal, Mr. Smith contends that the district court erred in denying his pretrial request for a continuance, that he did not violate § 1519 by manually deactivating his cameras, and that the district court imposed a substantively unreasonable sentence. We reject these arguments on the merits. Mr. Smith also purports to raise other appellate arguments, but he has forfeited review of these arguments through his perfunctory briefing. We therefore decline to address these arguments. Accordingly, exercising jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, we affirm Mr. Smith's conviction and sentence.

## I.    BACKGROUND

### A.    Factual History

Mr. Smith joined the Savanna Police Department ("SPD") in the summer of 2022. After joining the SPD, he first received field training from SPD Officer Byron Morgan, then attended the basic academy run by the Oklahoma Council on Law

2

Enforcement Education and Training ("CLEET"). While training Mr. Smith, Officer Morgan observed two incidents that concerned him. In the first incident, Mr. Smith was "overly friendly" and "almost flirtatious" with a female driver during a traffic stop. App. Vol. II at 402. In the second incident, which occurred when Officer Morgan and Mr. Smith were traveling separately in their own patrol vehicles, Mr. Smith pulled over a young female driver for a minor traffic violation, even though the police chief had instructed them not to stop drivers for minor violations. Moreover, Mr. Smith violated SPD policy by failing to radio in the information that he was initiating a traffic stop. Based on his observations of Mr. Smith's conduct, Officer Morgan warned him on two different occasions about a former SPD officer who had been federally investigated for sexual misconduct and was now serving a federal prison term.

After finishing his training, Mr. Smith worked his first solo shift for SPD—a twelve-hour shift between the hours of 6 p.m. on November 1 and 6 a.m. on November 2, 2022. Near the end of that shift, in the early morning hours of November 2, Mr. Smith pulled over a vehicle for speeding on the highway. He activated his overhead lights at 4:51 a.m., causing the dashcam in his patrol vehicle to start recording. Shortly thereafter, he activated his bodycam.

The driver of the vehicle, J.G.,[1] pulled over to the side of the highway. J.G. and his then-girlfriend, nineteen-year-old K.H., were traveling home to Tulsa,

---

[1] Following the Government's lead, we refer to the victim and other non-law-enforcement witnesses by their initials.

3

Oklahoma, from Houston, Texas. Mr. Smith asked both J.G. and K.H. to produce their driver's licenses, which he took back to his patrol car, where he learned that J.G.'s license had recently expired.

Mr. Smith returned to J.G.'s car, ordered K.H. and J.G. to get out of the car, and issued a traffic ticket to J.G. Mr. Smith asked K.H. if she could drive the car, since J.G. could not legally drive. She said that she could.

But rather than letting them go, Mr. Smith pivoted to asking them personal questions. For example, he asked how long J.G. and K.H. had been dating. He then manually deactivated his bodycam before asking K.H. additional questions, including what she did for work. She reluctantly informed him that she was a dancer at Lady Godiva's, which is identified in the record as a "gentleman's club." App. Vol. I at 51 n.1. This answer led to more questions about how long K.H. had worked there, if she liked working there, and other such personal matters.

After questioning K.H. about her work as a dancer, Mr. Smith asked for permission to search J.G.'s car. J.G. initially denied consent, but Mr. Smith said he would need to wait for a K-9 unit to come check the vehicle if J.G. did not agree to a search. J.G. and K.H. were tired from their long drive and did not want to wait for the K-9 unit, so they consented to a search of the car. Mr. Smith searched K.H.'s purse[2] and found a single pre-rolled marijuana cigarette that someone had given to K.H. at her workplace to promote a new dispensary.

---

[2] At trial, K.H. did not remember whether she specifically consented to a search of her purse.

Once he found the marijuana cigarette in K.H.'s purse, Mr. Smith stopped the search and ordered J.G. to return to his car. Mr. Smith then went back to his patrol vehicle and pressed the "stop record" button on his dashcam. Unbeknownst to Mr. Smith, however, his dashcam was equipped with a function called Record-After-The-Fact, which caused the camera to keep recording, albeit without sound, when the "stop record" button was pressed.

Mr. Smith hit the "stop record" button on his dashcam at 5:16 a.m. Mr. Smith then returned to where K.H. was standing and ordered her to go sit inside his patrol vehicle. K.H., feeling like she had no choice in the matter, complied with this order. The soundless footage from Mr. Smith's manually deactivated dashcam shows her returning to J.G.'s car seventeen minutes later, looking subdued and somber.

At trial, K.H. explained what happened during the seventeen minutes she spent in Mr. Smith's patrol car. He ordered her to sit in the front passenger seat of his vehicle, and he sat in the driver's seat. She turned her knees toward the window because she "didn't have a good feeling" about where this was going. *Id.* at 170. Mr. Smith asked her several personal questions about her relationship with J.G. and about her job, such as "[h]ow long [she] had been with [her] boyfriend, if [she] let people touch [her] at work, if [she] like[d] it, [if her] boyfriend let [her] have people touch [her]," and if she danced "fully nude." *Id.* at 171. She responded that she did not dance fully nude and did not let people touch her at work. Mr. Smith then commented on her breasts, twirled the marijuana cigarette in his hand, and asked,

5

"What am I going to do with you?" *Id.* at 172. K.H. did not understand what he meant by this.

At this point, Mr. Smith forcibly kissed K.H. and "stuck his tongue down [her] throat." *Id.* He then touched her inner leg and grabbed her breast aggressively and painfully. K.H. tried to stop the assault by saying that J.G. would be able to see them. Mr. Smith responded by moving the police spotlight in his vehicle to shine directly on J.G., blinding him from seeing what was happening in the patrol vehicle behind him. Mr. Smith next stuck one of his hands inside K.H.'s clothing and put his finger in her vagina, scratching her and causing her pain. He used his other hand to grab her hand, forcing her to rub his clothed but erect penis.

Mr. Smith eventually let K.H. go at 5:33 a.m. He gave her back her driver's license and marijuana cigarette before telling her she could leave. She went back to J.G.'s car and told him that she had been sexually assaulted by Mr. Smith. J.G. started filming Mr. Smith's patrol car, but Mr. Smith drove away about forty-five seconds after K.H. returned to J.G.'s car.

K.H. began driving J.G.'s car back to Tulsa, but she was too upset to drive more than a mile or two. She stopped the car and got in the passenger's seat, where she called her mother. Cellphone records confirm that K.H. first attempted to call her mother at 5:41 a.m., eight minutes after Mr. Smith released her from his patrol car. K.H.'s mother missed K.H.'s first phone call, but she answered the phone when K.H. tried calling her again four minutes later.

On the phone with her mother, K.H. began crying and screaming. The sounds of her distress were loud enough to wake up K.H.'s older sister, P.H., who was staying at their mother's house that night. P.H. had received training on sexual harassment and rape prevention during her time serving on the National Guard. She used this training to calm K.H. down enough to understand what she was saying. Once she understood what had occurred, P.H. called the county sheriff's office to report the sexual assault. K.H. also attempted to report the assault herself by contacting the police department in Tulsa.

Various agencies became involved in the investigation. An agent from the Oklahoma State Bureau of Investigation ("OSBI") contacted SPD Chief Matthew Hines. Chief Hines took custody of Mr. Smith's patrol vehicle and body camera. He pulled footage from the bodycam and dashcam, including the soundless Record-After-The-Fact footage. Chief Hines watched the footage and observed "the deactivation of the equipment intentionally and long before the traffic stop was completed." *Id.* at 297. He then provided the footage to the OSBI.

The physical cameras were sent to the company that supplied them to SPD, Motorola Solutions, for a full analysis. Engineers at Motorola Solutions confirmed with 100% certainty that both cameras were functioning normally on the morning of November 2 and that they were each manually deactivated during Mr. Smith's traffic stop of J.G. and K.H.

7

### B.     Procedural History

On August 9, 2023, Mr. Smith was charged in a three-count indictment.[3]

Count 1 alleged that he sexually assaulted K.H. on November 2, 2022, in violation of

18 U.S.C. §§ 242 and 250(b)(3). Counts 2 and 3 alleged that he "altered, concealed,

covered up, and falsified an SPD record" with intent to impede or influence a federal

investigation, in violation of 18 U.S.C. § 1519, by deactivating his bodycam

(Count 2) and dashcam (Count 3) during the November 2 traffic stop. App. Vol. I

at 16–17.

The case went to trial approximately seven months later, after the district court

granted two requests for a continuance, denied a third request for a continuance, and

denied Mr. Smith's motion to dismiss the indictment. Mr. Smith was found guilty on

all three counts and sentenced to a lengthy term of imprisonment. We discuss

relevant aspects of this procedural history below.

### 1.     First Continuance

On August 14, 2023, shortly after Mr. Smith was indicted, a federal public

defender was appointed to represent Mr. Smith. He soon thereafter filed an

unopposed motion for a continuance. The district court granted the motion, resetting

the trial date from October 2, 2023, to February 5, 2024.

---

[3] Approximately one month later, the Government filed a superseding indictment to correct a typographical error in the original indictment. This change did not affect the substance of the indictment in any way.

**2.      Motion to Dismiss**

Through the federal public defender, Mr. Smith filed a motion to dismiss Counts 2 and 3 of the superseding indictment, contending that his conduct did not fit within the statutory language of § 1519 because he did not alter or destroy any records, but instead merely deactivated his cameras. The district court denied the motion, reasoning that "[c]ausing a record to be incomplete, or omitting portions of a record, undoubtedly distorts or misrepresents the record as a whole." Suppl. App. at 19.

**3.      Second Continuance**

Approximately two months before the case was scheduled to go to trial, K.H. was the victim of an unrelated crime. Early in the morning of December 9, 2023, two or three men kicked down K.H.'s apartment door and physically assaulted her. K.H.'s injuries from the assault were serious enough that she required hospitalization and surgery. Accordingly, on December 15, 2023, the Government filed an unopposed motion for a thirty-day continuance for K.H. to heal from the assault and to undergo any additional medical treatments that might be needed. The district court granted the motion, resetting the trial date from February 5 to March 4, 2024.

**4.      Change to Retained Counsel**

On February 15, 2024—two and a half weeks before trial was scheduled to begin—the court held a pretrial conference, which Mr. Smith personally attended. At the beginning of this conference, the court confirmed with the parties that discovery was complete. The court discussed the anticipated length of the trial with the parties,

then asked if there was anything else for the court to do to help the parties as they neared trial. Mr. Smith's public defense counsel responded: "The only thing, Your Honor, that I would bring up is I sent an email yesterday, and I don't know if the Court wants to discuss this at this time, but Mr. Smith is intent on hiring private counsel." App. Vol. I at 88–89. The public defender then stated that he had recently spoken with the private attorney whom Mr. Smith intended to hire, John Cannon, who said that he would file an entry of appearance as soon as Mr. Smith paid his retainer.

The district court responded that Mr. Smith was "free to retain any counsel he likes, and that is not a problem for us." *Id.* at 89. But the court warned: "Mr. Cannon should be advised that this case is set first up for March the 4th and the [c]ourt is not inclined to continue the case because counsel gets into it late." *Id.* The court indicated that Mr. Cannon should not "get[] into the case" unless he knew "what the settings and what the deadlines are," and the court stated that it "assume[d] [Mr. Cannon] w[ould] be advised of that." *Id.* Defense counsel replied in the affirmative.

Mr. Cannon filed his notice of appearance on that same day. The next day, the public defender filed a motion to withdraw, in which he asserted that "Mr. Smith was actively seeking to hire private counsel of his choosing after the [public defender] was appointed." *Id.* at 92. The public defender also asserted that Mr. Smith "was unsuccessful in [hiring private counsel] early on in this case" but "was later able to procure funding and hired private counsel of his choosing." *Id.*

5.      **Motion for Third Continuance**

Mr. Cannon filed a motion for a continuance on Mr. Smith's behalf on February 20, 2024, five days after Mr. Cannon entered his appearance and less than two weeks before trial was scheduled to begin. In this motion, Mr. Cannon acknowledged that the case was "not unusual or complex." *Id.* at 97. However, he argued that he should be granted a sixty-day continuance because (1) he understood from communication with the public defender "that discovery consists of roughly 4,000 [pages] of written discovery, in addition to other digital discovery"; (2) he needed more time to review this discovery and prepare for trial; (3) the Government and the public defender had both been granted continuances earlier in the case; and (4) he had one criminal trial scheduled for March 25 and four trials scheduled in April. *Id.* at 95.

The district court then granted the public defender's motion to withdraw but denied the motion for a continuance. With respect to the motion for a continuance, the court noted that its "admonition regarding a request to continue was clearly ignored." *Id.* at 101. The court further noted that it had "experienced unprecedented caseloads and jurisdictional complexities in the past several years," primarily due to the impact of *McGirt v. Oklahoma*, 591 U.S. 894 (2020). *Id.* at 102. "In light of this," the court explained, "rescheduling trials at short notice is a drastic measure which the [c]ourt will consider in only the most compelling situations." *Id.* And the court concluded that no such compelling circumstances were present here. The case had already been pending for almost seven months. Mr. Smith had acknowledged that

11

"this case is not complex," and both parties had agreed that "discovery [wa]s complete, all issues ha[d] been fully briefed and litigated, and this case st[ood] ready for trial." *Id.* Moreover, the Government had clarified that "discovery in this case consists of only 2,544 pages of discovery, as opposed to retained counsel's estimation of roughly 4,000 pages." *Id*. (internal quotation marks omitted). The district court therefore found that there was "reasonable time necessary for effective preparation for trial in this matter in the exercise of due diligence." *Id.* Finally, the court concluded that "[a] continuance would not be in the best interest of the public, including the victim, the Government, its witnesses, and the [c]ourt." *Id.* at 103.

### 6.    Trial

On February 22, a second attorney associated with Mr. Cannon's law firm entered an appearance on behalf of Mr. Smith. Trial commenced on March 4 as scheduled, with Mr. Smith represented by two retained attorneys.

At the conclusion of the Government's case, Mr. Smith moved for a judgment of acquittal, which the district court denied. The jury subsequently found Mr. Smith guilty on all three counts.

### 7.    Sentencing

Mr. Smith's presentence investigation report ("PSR") calculated a total offense level of 42 and a criminal history category of I. Under the U.S. Sentencing Commission Guidelines, the advisory range for his crimes would have been 360 months to life imprisonment, but this range was capped by the statutory maximums for his crimes. Accordingly, the PSR calculated an advisory Guidelines

12

range of 360 to 480 months on Count 1 and 240 months (the statutory maximum) on Counts 2 and 3. *See* 18 U.S.C. §§ 250(b)(3), 1519. Because neither party objected to the PSR, the district court adopted it in its entirety.

At the sentencing hearing, the district court heard statements from K.H. and Mr. Smith as well as arguments from the Government and defense counsel. The district court then stated that it had considered the advisory Guidelines range and "all factors set forth in [18 U.S.C. § 3553(a)] to reach what [the court] believe[d] [wa]s the appropriate and reasonable sentence in this case." App. Vol. III at 677. The court discussed the seriousness of the offense as well as mitigating factors such as Mr. Smith's prior military service and lack of a criminal history record. Based on these considerations, the court ultimately sentenced Mr. Smith within the advisory Guidelines range for his offenses to concurrent sentences of 480 months on Count 1 and 240 months on Counts 2 and 3. Mr. Smith then filed this timely appeal.

## II.   DISCUSSION

Federal Rule of Appellate Procedure 28(a)(8) requires the argument section of an appellant's brief to contain the "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies," as well as, "for each issue, a concise statement of the applicable standard of review." Fed. R. App. P. 28(a)(8). Several sections of Mr. Smith's brief do not comply with this requirement. For instance, Mr. Smith purports to raise an Eighth Amendment challenge to the length of his sentence. However, this purported argument consists of a single, short sentence with no discussion of the applicable standard of review, no

13

citation to any case authority, and no citation to where, if at all, this argument was raised before the district court. Likewise, Mr. Smith's opening brief contains one paragraph labeled "Miscellaneous Errors," which purports to raise several issues primarily related to the district court's rulings on the parties' pretrial motions *in limine*. Appellant's Br. at 25. But this section of his brief cites no legal authorities, contains no reference to the applicable standard of review, and raises arguments in an extremely cursory fashion.

We will not address issues that Mr. Smith has waived through his perfunctory briefing. *See United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019) ("[A]rguments may be deemed waived when they are advanced in an opening brief only in a perfunctory manner." (internal quotation marks omitted)); *United States v. McBride*, 94 F.4th 1036, 1047–49 (10th Cir. 2024) (holding that a defendant waived various arguments by failing to state the standard of review, among other "briefing deficiencies"); *Valdez v. Macdonald*, 66 F.4th 796, 834 (10th Cir. 2023) ("[The appellant's] argument is conclusory, underdeveloped, and thus inadequately briefed and waived. We will therefore not consider it further.").

We conclude that Mr. Smith's appellate brief adequately raises three issues for our review: (1) a challenge to the district court's denial of his February 2024 motion for a continuance; (2) an argument that the scope of § 1519 does not extend to the manual deactivation of recording devices; and (3) an argument that his 480-month sentence is substantively unreasonable under the Guidelines. We reject these three arguments on the merits and affirm Mr. Smith's conviction and sentence.

### A.    Motion for Continuance

"We review the denial of a motion for continuance for abuse of discretion and will only find error if the district court's decision was arbitrary or unreasonable and materially prejudiced the defendant." *United States v. McClaflin*, 939 F.3d 1113, 1117 (10th Cir. 2019) (internal quotation marks omitted). Four factors guide our review of the district court's denial of a continuance: "(1) the diligence of the party seeking the continuance; (2) the likelihood the continuance, if granted, would have accomplished the stated purpose; (3) the inconvenience to the opposing party, witnesses, and the court; and (4) the need for the continuance and any harm resulting from its denial." *Id.* (quotation marks omitted). "The final factor is the most important." *Id.* (quotation marks omitted).

In applying these factors to Mr. Smith's case, we find guidance in two prior cases that likewise involved a motion to continue filed by a defendant who retained or sought to retain private counsel shortly before trial was scheduled to begin: *United States v. Rivera*, 900 F.2d 1462 (10th Cir. 1990) (en banc), and *United States v. Cervantes*, 4 F.4th 1089 (10th Cir. 2021). Because the facts of these cases inform our application of the four-factor test here, we discuss both cases in some detail, then turn to the question whether the district court abused its discretion by denying Mr. Smith's February 2024 motion for a continuance.

### 1.    *Rivera*

The defendant in *Rivera*, Luis Rivera, was charged with thirteen drug offenses enumerated in two indictments. 900 F.2d at 1465. One of the indictments also named

15

six other co-defendants. *Id.* The charges in these indictments arose from the defendants' importation by plane of hundreds of pounds of cocaine from Columbia to an isolated airstrip in Talihina, Oklahoma, and their subsequent transportation of that cocaine from Oklahoma to Florida. *Id.* At trial, the district court also admitted evidence of two drug offenses not specifically charged in either indictment, which involved drug trafficking between Florida and other states. *Id.* at 1465–66.

On January 24, 1985, six days after Mr. Rivera's arrest, Gregory Meier was appointed to represent him. *Id.* at 1466. About one month later, on February 27, 1985, Mr. Meier filed motions to withdraw as counsel, asserting that an "irreconcilable conflict" had arisen when he "recommended a certain course of action during plea negotiations with which [Mr. Rivera] disagreed," causing Mr. Rivera to lose confidence in him. *Id.* The district court denied Mr. Meier's motions to withdraw. *Id.* Then, "[o]n March 8, 1985, another attorney, D.D. Hayes, visited with [Mr. Rivera]." *Id.* A few days later, on March 11, "[Mr.] Hayes filed formal entries of appearance on behalf of [Mr. Rivera]." *Id.* Trial was scheduled to begin one week later, on March 18, 1985. *See id.* at 1467.

"On March 13, [Mr.] Hayes requested a continuance," stating that he needed time "to examine the 'voluminous' documents necessary to prepare [Mr.] Rivera's defense." *Id.* at 1466. Mr. Hayes asserted that the materials he needed to review included "two transcripts of prior trials and numerous FBI reports," "one box containing thousands of documents in the nature of [Mr. Rivera's] business records from Miami, Florida," and "several more boxes of such material" that he anticipated

16

receiving soon. *Id.* "[Mr.] Hayes further asserted that he needed to master the numerous technical details relating to [the] aircraft involved in this case, as well as the normally complicated issues of a conspiracy type case." *Id.* (internal quotation marks omitted). The district court denied the motion for a continuance on March 14. *Id.*

"On March 18, just prior to the beginning of jury selection for [Mr. Rivera's] trial, [Mr.] Hayes renewed his motion for a continuance." *Id.* at 1467. He "noted that he had still not received all of the documents from Miami that he anticipated using in preparing [Mr.] Rivera's defense," and he "told the court that until he had agreed to take on [Mr. Rivera's] case, he 'had no idea of the magnitude of paper work and of the necessity of obtaining evidence from Miami, Florida.'" *Id.*

The prosecutor asserted, however, that Mr. Hayes had been working diligently on the case and was now more familiar with the government's evidence than the prosecutor was. *Id.* The district court additionally "noted that [Mr.] Meier was still assigned to the case and that if [Mr. Rivera] so desired, [Mr.] Meier would be directed to continue working on the case at government expense." *Id.* Mr. Hayes responded that both he and Mr. Rivera wanted Mr. Meier to remain on the case, so the district court denied Mr. Meier's pending motion to withdraw. *Id.* "The court also denied the renewed motion for a continuance, although later, after the government had rested its case, the court did grant [Mr.] Hayes' request for a weekend continuance to enable him to prepare [Mr.] Rivera to testify." *Id.* At the conclusion of

the trial, Mr. Rivera was found guilty of all thirteen counts and sentenced to a prison term of life plus 140 years. *Id.*

On appeal, Mr. Rivera argued in part that the district court erred in denying his motion for a continuance. *Id.* at 1475. But this court held en banc that Mr. Rivera had "failed to offer sufficient proof" to establish an abuse of discretion under our four-factor test. *Id.*

We held that the first factor—"the diligence of the party requesting the continuance"—weighed against Mr. Rivera for multiple reasons, including the fact that he "had trial counsel for almost six weeks prior to the request for a continuance," and did not file a motion for a continuance until "five days prior to the date on which the jury trial was scheduled to begin." *Id.*

We then held that the second factor—"the likelihood that a continuance would accomplish the purpose underlying the articulated need for a delay"—was satisfied because "[g]ranting the continuance would have accomplished" the stated purpose of giving Mr. Hayes "more time to examine [Mr. Rivera's] business records and other materials." *Id.* at 1475 & n.19. But we concluded that this was the only factor Mr. Rivera had satisfied. *Id.* at 1475.

On the third factor, which "concerns the inconvenience caused by the continuance," we reasoned that "any continuance granted practically on the eve of trial inevitably will disrupt the schedules of the court, the opposing party, and the witnesses who have been subpoenaed or who have voluntarily arranged their

18

schedules to attend the trial." *Id.* And we noted that when a case is scheduled for a jury trial, a continuance may inconvenience jurors as well. *Id.*

Finally, on the fourth and "most important factor," we held that Mr. Rivera had not adequately shown that he was "materially prejudiced" by the denial of a continuance. *Id.* at 1476 (quotation marks omitted). Although a continuance would certainly have provided Mr. Hayes with additional time to review the thousands of documents potentially relevant to the defense, Mr. Rivera failed to identify either at trial or on appeal "precisely what would have been discovered from the documents if he had been granted a continuance." *Id.* Admittedly, Mr. Rivera "was still receiving documents during the trial," which "undoubtedly imposed an added burden on defense counsel." *Id.* But "the fact that [Mr. Rivera] had the services of two counsel during the trial should have eased that burden considerably." *Id.* And Mr. Rivera had "failed to make any showing that the failure to grant a continuance prevented him from introducing any documents that would have been sufficiently important to his defense so as to constitute material prejudice." *Id.*

Moreover, Mr. Rivera made no showing that the denial of a continuance caused his counsel to be inadequately prepared. *Id.* "The issues at trial were not so complex that the need for a continuance would have been obvious, particularly since defense counsel had the advantage of having the transcripts of two previous trials concerning many of the same events." *Id.* And the record showed that defense counsel "worked very hard to prepare prior to trial" and presented a competent

19

defense. *Id.* We therefore held that the district court did not abuse its "sound discretion" by denying Mr. Rivera's motion for a continuance. *Id.*

## 2.    *Cervantes*

The defendant in *Cervantes*, Armando Cervantes, was charged with two drug trafficking offenses. 4 F.4th at 1092. Mr. Cervantes made his initial appearance in August 2010, and the district court appointed Cindi Wood to represent him. *Id.* The court subsequently set trial to begin on January 4, 2011. *Id.* "Two weeks before trial, on December 21, 2010, [Mr. Cervantes] attempted to retain private, out-of-state defense counsel." *Id.* Mr. Cervantes paid private counsel a $5,000 retainer, but "counsel did not speak with Ms. Wood, enter an appearance, or otherwise inform the court of their intent to represent [Mr. Cervantes]." *Id.* "On January 3, 2011, the day before trial, private counsel finally contacted Ms. Wood. The same day, [Mr. Cervantes] told Ms. Wood that he hired private counsel in December." *Id.*

After learning this information, Ms. Wood filed a motion to withdraw and to continue the trial. *Id.* "The court denied the motion, noting that the jurors were already braving winter weather to travel to the courthouse. The court also emphasized that it had not authorized representation by out-of-state counsel, who had yet to file any motions to appear pro hac vice." *Id.*

On the scheduled trial date of January 4, 2011, the district court "conducted a second hearing related to [Mr. Cervantes's] request for new counsel." *Id.* Mr. Cervantes "asked the court for time to retain new counsel, and Ms. Wood renewed her motion for a continuance." *Id.* "The court again denied the motion but

20

afforded Ms. Wood one additional day to prepare for trial." *Id.* That night, however, Mr. Cervantes fled the country, and he was subsequently tried and convicted in absentia. *Id.* at 1092–93. Nine years later, he was apprehended and sentenced to 188 months of imprisonment. *Id.*

On appeal, Mr. Cervantes argued in part that the district court abused its discretion by denying his motion to continue. *Id.* at 1093. We rejected this argument, holding that he had not shown an abuse of discretion under this circuit's four-factor test. *Id.* at 1093–94.

Regarding the first factor, we held that Mr. Cervantes did not diligently seek a continuance because (1) he "waited more than four months after his arraignment to seek out private representation, just two short weeks before trial"; (2) "he failed to inform Ms. Wood that he had retained private counsel," making him "partly to blame for the alleged breakdown of communication"; and (3) "Ms. Wood did not file the motion to continue until the day before trial, even though she had acted as [Mr. Cervantes's] counsel since August 2010, and their communication allegedly broke down in December 2010." *Id.* at 1094.

We then held that the second factor weighed in Mr. Cervantes's favor because a continuance, if granted, would have given Ms. Wood "additional time to review recently disclosed evidence" and "to discuss two alternative theories of defense with [Mr. Cervantes], one which would have required him to testify." *Id.*

The third factor weighed against Mr. Cervantes, however. We quoted our holding in *Rivera* that "any continuance granted practically on the eve of trial

21

inevitably will disrupt the schedules of the court, the opposing party, and the witnesses who have been subpoenaed or who have voluntarily arranged their schedules to attend the trial." *Id.* (quoting *Rivera,* 900 F.2d at 1475). And we held that "[t]his universal burden would have been compounded" by the circumstances facing the district court when Mr. Cervantes requested a continuance. *Id.* "[T]he court's calendar was unusually full" due to the presiding judge's planned retirement, "making it a challenge to reschedule." *Id.* And "[i]f the judge was unable to reschedule [Mr. Cervantes's] case before his retirement, the case would have necessarily been left to a different judge, creating an additional burden on the court." *Id.* We therefore concluded that "continuing the trial would have resulted in a substantial burden to the Government, the court, and witnesses." *Id.*

The fourth factor likewise weighed against Mr. Cervantes. *Id.* at 1094–95. He did not argue, and the record did not show, "that Ms. Wood's performance was deficient or that the denial of his motion to continue materially prejudiced him." *Id.* at 1095. This factor therefore supported the district court's denial of the motion for a continuance. *Id.*

"In sum," we held, "granting the motion to continue would have accomplished its stated purpose, but (1) [Mr. Cervantes] was not diligent in seeking a continuance, (2) the inconvenience resulting from a continuance would have been substantial, and (3) [Mr. Cervantes] was not prejudiced by denial of the motion." *Id.* We therefore concluded that "the district court did not abuse its discretion in denying a continuance." *Id.*

22

3.     **Analysis**

Applying our four-factor test here, we hold that the district court did not abuse its discretion by denying Mr. Smith's motion for a continuance. As in *Rivera* and *Cervantes*, the second factor weighs in Mr. Smith's favor, but the other factors do not. Mr. Smith has therefore failed to show that the district court abused its sound discretion by denying his motion.

*a.     Diligence*

Mr. Smith argues that the diligence factor weighs in his favor because retained counsel filed a motion to continue within five days of being retained. He asserts in a footnote that "[t]he relevant analysis is the diligence of retained counsel, not necessarily that of Mr. Smith himself," but he cites no legal authorities to support this argument. Appellant's Br. at 17 n.3. He also argues that he has proven diligence based on the public defender's statement less than three weeks before trial that "Mr. Smith was actively seeking to hire private counsel of his choosing after the [public defender] was appointed." App. Vol. I at 92.

Mr. Smith's argument that our analysis focuses on the diligence of newly retained counsel rather than the defendant is raised only in a footnote and unsupported by any legal authority. We could therefore decline to address this argument based on Mr. Smith's failure to adequately brief it on appeal. *See McBride*, 94 F.4th at 1047–49. But this argument fails on the merits regardless.

The first factor of our four-factor test evaluates "the diligence of the *party* seeking the continuance." *McClaflin*, 939 F.3d at 1117 (emphasis added) (quotation

marks omitted). Consistently with that language, we held in *Rivera* that this factor was not satisfied even though retained counsel filed a motion for a continuance just two days after he entered an appearance on behalf of the defendant, as the defendant was not himself diligent. 900 F.2d at 1466, 1475. And in *Cervantes*, we considered the defendant's lack of diligence in seeking out private counsel and in communicating with appointed counsel, as well as appointed counsel's lack of diligence in seeking a continuance when their communication broke down, to conclude that the defendant had not shown he acted with diligence. 4 F.4th at 1094. Although these cases show that defense counsel's diligence may be relevant to our assessment of the defendant's diligence, they certainly do not support Mr. Smith's argument that the defendant's diligence is irrelevant to this inquiry.

And Mr. Smith has not presented sufficient evidence to support the conclusion that he acted diligently in seeking a continuance. *See Rivera*, 900 F.2d at 1475 (indicating that the party seeking a continuance has the burden of proof for each factor in the four-factor test). Mr. Smith relies on the public defender's assertion in February 2024 that Mr. Smith "was actively seeking to hire private counsel of his choosing after the [public defender] was appointed." App. Vol. I at 92. But even assuming this representation is sufficient to establish that Mr. Smith was diligent in seeking out private counsel, the record demonstrates that he was not diligent in conveying this fact to the district court and in requesting a continuance on this basis. When Mr. Smith finally informed the court that he intended to retain private counsel, he had already been represented by the public defender for six months, and trial was

24

scheduled to occur in less than three weeks. Moreover, he still did not seek a continuance on this basis until five more days had elapsed. This lack of diligence weighs against his request for a continuance. *See Cervantes*, 4 F.4th at 1094 (holding that delayed communication regarding the defendant's intention to hire private counsel weighed against a finding of diligence); *Rivera*, 900 F.2d at 1475 (holding that it would not be an abuse of discretion "to refuse to grant a continuance because of [appointed counsel's] tardiness in requesting a delay" before retained counsel entered the picture).

b.    *Usefulness of continuance*

As in *Rivera* and *Cervantes*, this factor weighs in Mr. Smith's favor. Like in those cases, additional time would have given Mr. Smith's counsel more time to review the discovery and prepare a defense. *See Rivera*, 900 F.2d at 1475 & n.19; *Cervantes*, 4 F.4th at 1094. As in those cases, however, this factor is not determinative. *See Rivera*, 900 F.2d at 1475–76; *Cervantes*, 4 F.4th at 1094–95.

c.    *Inconvenience*

The inconvenience factor weighs strongly against Mr. Smith. In *Rivera*, we recognized in an en banc decision that "any continuance granted practically on the eve of trial inevitably will disrupt the schedules of the court, the opposing party, and the witnesses who have been subpoenaed or who have voluntarily arranged their schedules to attend the trial." 900 F.2d at 1475. Moreover, as we explained in *Cervantes*, "[t]his universal burden" will be "compounded" where "the court's calendar [i]s unusually full." *Cervantes*, 4 F.4th at 1094.

25

Here, as in *Cervantes*, the district court's calendar was "unusually full." *Id.* The court explained that it was experiencing "unprecedented caseloads" due to the Supreme Court's recent *McGirt* decision. App. Vol. I at 102. Accordingly, the court explained that rescheduling a trial at short notice would cause such a significant inconvenience that the court would consider doing so "in only the most compelling situations." *Id.*

In arguing that the district court should have granted his motion for a continuance, Mr. Smith emphasizes the fact that his trial lasted only three days and involved only seven witnesses. But while the continuance of a three-day trial will certainly be less disruptive than the continuance of a lengthier trial, this does not mean that the inconvenience of continuing a three-day trial is "*de minim[i]s*" as Mr. Smith argues. Appellant's Br. at 18. Indeed, the trial in *Cervantes* lasted four days at most, but we nevertheless held that rescheduling that trial on short notice would have caused a significant inconvenience based on the district court's unusually full calendar.[4] *See* 4 F.4th at 1093–94.

---

[4] In his reply brief, Mr. Smith attempts to distinguish *Cervantes* on its facts, arguing that the district court there denied a continuance because the jurors were already en route to the courthouse in wintry conditions. But while the district court in *Cervantes* may have emphasized the jurors' travel arrangements, this consideration played little to no role in our decision to affirm the district court's denial of a continuance. *See United States v. Cervantes*, 4 F.4th 1089, 1093–95 (10th Cir. 2021). Rather, we focused almost exclusively on the fact that the district court's "calendar was unusually full," which made it difficult for the district court to adjust its schedule to accommodate a last-minute continuance. *Id.* And the situation before us here invokes the same broad concern about the district court's ability to accommodate changes to its calendar, regardless of the specific factual differences between this case and *Cervantes*.

26

Mr. Smith also points out that the Government was granted a continuance in mid-December 2023, which reset the trial from February to March 2024. He argues that a continuance must therefore have been possible when he requested it in February 2024. However, the fact that the court and the witnesses were able to adjust their schedules in December 2023, six weeks before trial was then scheduled to occur, does not prove that the court, the Government, and the witnesses would have experienced no significant inconvenience from yet another continuance, this one requested less than three weeks before trial.

The district court was in a much better position than this court to determine how much it would have been inconvenienced if it had granted a continuance to Mr. Smith less than three weeks before trial was scheduled to begin. And neither the record nor Mr. Smith's appellate arguments provide any basis for us to conclude that the district court's evaluation of this factor was incorrect. Accordingly, deferring to the district court's view of its own scheduling obstacles, we hold that the inconvenience factor weighs against Mr. Smith's delayed request for a continuance.

> d.   *Material prejudice*

Comparing the facts of this case to the facts in *Rivera*, we hold that the material-prejudice factor likewise weighs against Mr. Smith. In *Rivera*, retained counsel had less than a week to prepare a defense in a case involving two indictments, thirteen criminal counts, multiple co-defendants, evidence of unindicted crimes committed in other states, and "numerous technical details relating to aircraft." 990 F.3d at 1466. Moreover, retained counsel asserted in *Rivera* that he

27

needed time to review a large volume of materials relevant to the defense, including "one box containing thousands of documents in the nature of . . . business records from Miami, Florida," and "several more boxes of such material" that counsel anticipated receiving soon. *Id.* Nevertheless, we held in *Rivera* that "[t]he issues at trial were not so complex that the need for a continuance would have been obvious." *Id.* at 1476. And because the defendant had not specifically identified how he was materially prejudiced from the denial of the continuance, we held that he had not met his burden of satisfying the fourth factor of our four-factor test. *Id.*

Mr. Smith was charged in a single three-count indictment that did not name any co-defendants. No evidence of other crimes was introduced at his trial. There were fewer than 3,000 pages of discovery, and there was no reason to think that any additional documents would need to be reviewed. And although, unlike in *Rivera*, Mr. Smith's retained counsel did not have the benefit of co-counsel who had been involved in the litigation for a few months, Mr. Smith did "ha[ve] the services of two counsel during the trial," which "should have eased [retained counsel's] burden considerably," *id.*

The facts in this case thus suggest a lesser potential for prejudice than the facts we found insufficient to support this factor in *Rivera*. And, as in *Rivera*, Mr. Smith does not "ma[k]e any specific allegation on appeal as to precisely what would have been discovered . . . if he had been granted a continuance." *Id.* He does not "make any showing that the failure to grant a continuance prevented him from introducing any documents that would have been sufficiently important to his defense so as to

28

constitute material prejudice." *Id.* He does not explain how further research into the pertinent statutes would have helped retained counsel to launch a more effective defense. Nor does he otherwise provide any details as to how counsel was allegedly unprepared for trial or how this alleged lack of preparedness prejudiced the defense. *See id.* We therefore conclude that Mr. Smith has not met his burden of showing that he was materially prejudiced by the district court's denial of his request for a continuance.

> e.    Conclusion

In sum, the second factor of our four-factor test weighs in Mr. Smith's favor, as "granting the motion to continue would have accomplished its stated purpose," *Cervantes*, 4 F.4th at 1095, but the other three factors weigh against Mr. Smith's request for a continuance. He "was not diligent in seeking a continuance," and "the inconvenience resulting from a continuance would have been substantial." *Id.* Moreover, he has not satisfied "by far the most important factor" of our test because he has not specifically identified how he was materially prejudiced by the denial of his motion. *Rivera*, 900 F.2d at 1476 (quotation marks omitted). We therefore hold that the district court did not abuse its discretion in denying his February 2024 motion for a continuance. *See id.*; *see also Cervantes*, 4 F.4th at 1095.

## B.    Scope of 18 U.S.C. § 1519

Next, Mr. Smith contends that his manual deactivation of his bodycam and dashcam did not fall within the scope of § 1519, as the plain language of the statute

does not prohibit "passive behavior such as failing to record criminal conduct."[5] Reply Br. at 9. He argues that the district court therefore erred in denying his motion to dismiss Counts 2 and 3 of the indictment as well as his motion for a judgment of acquittal.

We review the district court's statutory interpretation of § 1519 de novo, viewing the evidence in the light most favorable to the Government. *See United States v. Murphy*, 100 F.4th 1184, 1195–96 (10th Cir. 2024); *see also United States v. Berres*, 777 F.3d 1083, 1089 (10th Cir. 2015) ("We generally review a district court's denial of a motion to dismiss a criminal indictment for abuse of discretion, but review any statutory interpretation issues involved in the ruling de novo.").

Section 1519 provides:

Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

18 U.S.C. § 1519.

---

[5] Mr. Smith briefly suggests that § 1519 might also be inapplicable to his conduct because the statute "was promulgated to combat financial fraud." Appellant's Br. at 21. However, to the extent Mr. Smith is attempting to raise a separate argument regarding the types of investigations that fall within the scope of § 1519, this argument has been waived both by Mr. Smith's perfunctory appellate briefing and by his failure to raise this issue before the district court or to make a plain error argument on appeal. *See United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019); *United States v. McBride*, 94 F.4th 1036, 1044–46 (10th Cir. 2024).

Viewing the facts in the light most favorable to the Government, we conclude that Mr. Smith's conduct falls within the scope of this statute because his knowing and intentional deactivation of his recording devices falsified and altered the records created by those devices.[6] When Mr. Smith pulled J.G.'s vehicle over, he activated his cameras to record the stop. This triggered the creation of official law enforcement records with potential relevance for future investigations into any crimes that might be discovered or committed—by Mr. Smith or by anyone else—during this encounter. And Mr. Smith had been trained pursuant to standard SPD policy to record every interaction with the public and to turn off his cameras only when the interaction was finished. Accordingly, when he returned his cameras to SPD at the end of his shift, the recordings on the cameras should have reflected the entirety of every interaction he had with the public during his shift. But Mr. Smith took deliberate and affirmative steps to manipulate the contents of these recordings by manually deactivating both of his cameras before he began his sexual assault of K.H. By so doing, he caused the recording from his dashcam to be soundless during the seventeen minutes in which he sexually assaulted K.H., while the recording from his bodycam was completely missing a large segment of the stop. And Mr. Smith did not inform his supervisor or anyone else at the police station that, contrary to SPD

---

[6] Because we conclude that Mr. Smith's conduct constituted an unlawful falsification and alteration of a record, we do not decide whether his conduct might have additionally qualified as an unlawful concealment or covering up of a record.

31

policy, these recordings did not contain a full record of his interactions with the public during his shift.

Other circuits have considered an analogous situation where a law enforcement officer knowingly omits information from an official report with the intent to obstruct, impede, or influence an investigation. And every circuit court to consider this issue has concluded that such conduct violates § 1519. *See, e.g.*, *United States v. Underwood*, 95 F.4th 877, 889 (4th Cir. 2024); *United States v. Moyer*, 674 F.3d 192, 207–08 (3d Cir. 2012); *United States v. Schmeltz*, 667 F.3d 685, 688 (6th Cir. 2011); *United States v. Lanham*, 617 F.3d 873, 887 (6th Cir. 2010). For instance, the Fourth Circuit held in *Underwood* that a reasonable jury could find a police officer guilty of violating § 1519 based on his omission from his arrest report of the information that he had seized a cellphone belonging to the arrestee's mother, as the facts supported the inference that "the omission of the cellphone seizure from the report was a deliberate attempt to conceal improper police conduct." 95 F.4th at 889. Likewise, the Third Circuit held in *Moyer* that a police chief violated § 1519 by omitting the names of known suspects from his official police reports, reasoning that "[i]t borders on the ridiculous to assert that a Chief of Police would *not* have a duty to disclose the identity of suspects in his official police reports or, conversely, that withholding the names of suspects—known to him—in those official police reports would be deemed acceptable."[7] 674 F.3d at 207.

---

[7] The dissent notes that the defendants in *United States v. Underwood*, 95 F.4th 877 (4th Cir. 2024), and *United States v. Moyer*, 674 F.3d 192, 207–08 (3d Cir.

And the Sixth Circuit has published two opinions in which it has held that the omission of material information from an official report may constitute an unlawful falsification of a record under § 1519. The Sixth Circuit first decided *Lanham*, which involved a detention officer's conviction under § 1519 for falsifying an official report regarding a prison rape.[8] *See* 617 F.3d at 887. On appeal, the officer argued that his conviction must be overturned because "his report contained omissions of fact rather than affirmative lies." *Id.* But the Sixth Circuit rejected this argument, reasoning that "[m]aterial omissions of fact can be interpreted as an attempt to 'cover up' or 'conceal' information."[9] *Id.* Accordingly, the court held that a reasonable jury "could conclude that [the detention officer] falsified his report" in violation of § 1519. *Id.*

---

2012), "embedded lies in their reports" as well as "omit[ing] material truths." Dissent at 3. However, the Third and Fourth Circuits did not indicate that the presence of an affirmative lie was necessary to affirm the defendants' convictions under § 1519. *See Underwood*, 95 F.4th at 889–90; *Moyer*, 674 F.3d at 207–08. Rather, the reasoning of these cases supports the conclusion that a material omission from an official record alone can constitute a violation of § 1519, regardless of whether any affirmative lies are present. *See Underwood*, 95 F.4th at 889–90; *Moyer*, 674 F.3d at 207–08.

[8] Although the introduction and background sections of the Sixth Circuit's opinion in *United States v. Lanham*, 617 F.3d 873 (6th Cir. 2010), state in part that the detention officer was convicted of "making a false entry," *id.* at 878, 881, the analysis section of the opinion correctly describes the basis for this conviction as "unlawfully falsifying . . . records in violation of 18 U.S.C. § 1519," *id.* at 886–87, consistent with the language of the indictment.

[9] We note that the Fourth and Sixth Circuits have assumed that an omission of fact must be material to violate § 1519, *see Underwood*, 95 F.4th at 889; *Lanham*, 617 F.3d at 887, while the Third Circuit has "refuse[d] to require such a conclusion," reasoning that "materiality is not an express element of § 1519." *Moyer*, 674 F.3d at 207–08. The parties have not briefed this issue, and it is unnecessary for us to resolve this dispute here. Instead, we assume without deciding that the stricter standard requiring a finding of materiality must be satisfied, and we uphold

Next, the Sixth Circuit decided *Schmeltz*, in which Deputy Jay Schmeltz challenged his conviction under § 1519 for falsifying a record based on his omissions of information from his official report regarding the death of Carlton Benton, a pretrial detainee. *See* 667 F.3d at 685–86. Mr. Benton had been released from a hospital into the custody of Deputy Schmeltz and another deputy, who used force against Mr. Benton both at the hospital and after they arrived at the jail. *Id.* at 686. Among other incidents, Deputy Schmeltz shoved Mr. Benton while he was standing with his hands and legs restrained, causing him to hit his head on the wall and fall to the floor. *Id.* And after Deputy Schmeltz and other deputies took Mr. Benton to a medical unit in the jail, Sergeant John Gray used a "sleeper hold" to knock him unconscious. *Id.* Mr. Benton never regained consciousness, and he died two days later. *Id.*

Count 6 of the indictment charged Deputy Schmeltz with violating § 1519 by "knowingly falsif[ying] a document—specifically an official Correction Officer Report reflecting his actions, and the actions of his fellow corrections officers, in relation to uses of physical force on [Mr. Benton] on May 30, 2004—with the intent to impede, obstruct, and influence the investigation . . . of that matter." *Id.* at 686–87. The indictment specified that Deputy Schmeltz falsified a record when he "omitted from his official report any mention of his assault of [Mr. Benton] in the Jail's

---

Mr. Smith's conviction under this standard because the portions of the recordings during which Mr. Smith sexually assaulted K.H. are obviously material.

Booking area; any mention of [Sergeant] Gray's use of a 'sleeper hold' on

[Mr. Benton]; and any mention of the fact that [Sergeant] Gray had rendered

[Mr. Benton] unconscious with the sleeper hold." *Id.* at 687.

On appeal, Deputy Schmeltz argued that "Count 6 was duplicitous because the

omissions from his report constitute separate false entries and therefore present three

separate violations of § 1519." *Id.* at 688. However, the Sixth Circuit noted that he

"was not charged with making 'a false entry,' but rather the indictment alleged he

'falsified a document.'" *Id.* The court explained that "the 'false entry' charge is

usually reserved for entries made on pre-existing forms rather than narrative reports,"

and concluded that "[t]he 'falsifies' clause of § 1519 was thus intended to punish the

falsification of a document, rather than specific statements or omissions within a

document." *Id.* The court therefore rejected Deputy Schmeltz's argument that

Count 6 of the indictment was duplicitous. *Id.* And the court upheld

Deputy Schmeltz's § 1519 conviction for falsification of a record based on his

creation of an official narrative report that painted a false picture of Mr. Benton's

death by omitting information about Deputy Schmeltz's assault of Mr. Benton in the

booking area, Sergeant Gray's use of a "sleeper hold" on Mr. Benton, and

Mr. Benton's loss of consciousness as a result of this sleeper hold. *Id.*

This court reached a similar conclusion in *United States v. Weidner*, 437 F.3d

1023 (10th Cir. 2006), which involved a conviction under 18 U.S.C. § 1005 for

knowingly making (or causing to be made) a false entry into bank records with intent

to defraud. *Id.* at 1037; *see also* 18 U.S.C. § 1005. The defendants in *Weidner*—

35

a bank president and a wealthy bank customer—failed to disclose in several bank records, including a loan proposal submitted to the bank, that the bank customer planned to use a requested multi-million-dollar loan from the bank in part to fund his own $1.5-million loan to the bank president, who wanted the money to invest in a real estate project. *Weidner*, 437 F.3d at 1027–29, 1038–40. The bank president and bank customer did not execute a promissory note for the customer's loan to the bank president until after the bank had issued its loan to the bank customer. *Id.* at 1028–29. And the bank loan proposal was arguably truthful "in broad terms," as it accurately provided the truthful but incomplete information that the bank loan would be used "to 'make business investments.'" *Id.* at 1039. Nevertheless, we held that the defendants had made a false entry in a bank record by omitting important details from the loan proposal about their intentions for the loan. *See id.* at 1038–40.

We reasoned that § 1005 is intended to ensure that a bank's records provide "an accurate picture of its condition." *Weidner*, 437 F.3d at 1039. Accordingly, "[a]n omission where an honest entry would otherwise be made can be a false entry" for purposes of § 1005 because the omission distorts the picture of the bank's condition. *Id.* at 1037 (quoting *United States v. Copple*, 827 F.2d 1182, 1187 (8th Cir. 1987)); *see also id.* at 1039 ("[A]n omission of material information relating to matters which should be disclosed in order to show a true picture of the transactions involved, as well as an actual misstatement, qualifies as a false entry under the statute." (quoting *United States v. Cordell*, 912 F.2d 769, 774 (5th Cir. 1990)). We therefore upheld the defendants' convictions, concluding that a defendant who intentionally omits

36

information from an official record to create a false impression of the situation may be found guilty of making a false entry even if the record contains no affirmative falsehoods. *See id.* at 1037, 1039.

*Weidner* and cases from our sister circuits thus stand for the proposition that intentionally creating a misleadingly incomplete official record can be enough to satisfy a conviction for falsifying or making a false entry in the record. We find these cases persuasive, and we conclude that Mr. Smith engaged in such conduct here. Like the bank records in *Weidner* and the law enforcement reports at issue in *Underwood*, *Moyer*, *Lanham*, and *Schmeltz*, the recordings from Mr. Smith's traffic stop were official records that purported to convey an accurate picture of the situation at hand. And, like the defendants in those cases, Mr. Smith knowingly omitted pertinent information from these official records to convey a false picture of this situation. True, he did not omit information from the records in quite the same way as those defendants did: they knowingly chose to omit inculpatory facts from their reports or other disclosures, while Mr. Smith knowingly chose to deactivate his cameras so that the official recordings of the traffic stop would not include inculpatory footage. But regardless of the mechanism, Mr. Smith engaged in the same prohibited conduct of falsifying an official record by affirmatively causing "[a]n omission where an honest entry would otherwise be made." *Id.* at 1037 (quoting *Copple*, 827 F.2d at 1187).

The dissent argues that the cases from our sister circuits are distinguishable because "someone reviewing Officer Smith's video-audio recordings would instantly realize that he stopped the recordings to avoid capturing the sexual assault," while

"someone reading a police report containing lies and material omissions would lack an equally suspicious indicator." Dissent at 2–3. However, it was only because of the soundless footage from Mr. Smith's dashcam—recorded without his knowledge—that the videos were proven to be incomplete. Without that, K.H.'s allegations might have been unproven. And the determination whether a defendant falsified a record does not depend on whether his omissions of material information could have been detected despite his efforts at concealment. *Cf. Weidner*, 437 F.3d at 1037 ("The entry is rendered no less false simply because, through considerable effort and a piecing together of minute details, the bank might have been able to discover the truth." (quoting *United States v. Luke*, 701 F.2d 1104, 1108 n.7 (4th Cir. 1983)).

The dissent similarly argues that someone reading a police report "would expect that all material investigative facts up to the date of the report would be included in it," which the dissent suggests is different from this situation. Dissent at 3. However, the jury heard testimony that SPD officers are required to film all interactions with the public. Accordingly, the jury could reasonably infer that someone watching a recording from Mr. Smith's bodycam or dashcam would expect it to include everything that happened during the citizen encounter. And again, we will not overturn the jury's verdict simply because Mr. Smith's falsification of the records was less successful than he intended it to be due to the Record-After-The-Fact feature on his dashcam.

Mr. Smith contends that he did not alter or falsify any records of the stop because he did not delete footage from his cameras or otherwise tamper with an

38

existing recording of the sexual assault. But an individual can violate § 1519 without removing or destroying any existing documentation of a fact. There is no indication in *Underwood*, *Moyer*, *Lanham*, or *Schmeltz*, for instance, that the defendants wrote out truthful police reports and then physically deleted any words or sentences that revealed truths they wished to conceal. *See Underwood*, 95 F.4th at 889; *Moyer*, 674 F.3d at 207–08; *Lanham*, 617 F.3d at 887; *Schmeltz*, 667 F.3d at 688. Just as in this case, the records at issue in those cases were intentionally created in an incomplete manner that never included all material information regarding the incident in question. Thus, as here, those defendants omitted material information from their reports by failing to document that information in the first place, rather than by removing existing documentation. And this was sufficient for our sister circuits to sustain the defendants' convictions under § 1519.

Likewise, in *United States v. Rowland*, 826 F.3d 100 (2d Cir. 2016), the Second Circuit rejected the argument that "'falsify' means only to tamper with a preexisting document." *Id.* at 107–08. Citing different dictionary definitions of the term "falsify," the court concluded that, "in common usage, it is acceptable to say that someone 'falsifies' a document when he creates a document that misrepresents the truth." *Id.* at 108.

Moreover, this court reached a similar conclusion with respect to a similar statute in *Weidner*, 437 F.3d at 1037–40. Our opinion in *Weidner* contains no indication that the defendants tampered with an existing bank record; rather, we explained that the defendants created (or caused the creation of) bank documents that

from the onset omitted material information regarding the true purpose of a requested loan. *See id.* And, like our sister circuits in the § 1519 context, we concluded in the § 1005 context that evidence of the defendants' knowing and intentional omission of material information from official records was sufficient to sustain their convictions for falsifying these records. *See id.*

The dissent argues that the decisions of our sister circuits are distinguishable because the reports in those cases did not include complete information about past events, while the recordings in this case included complete information about everything that occurred up until the recording devices were deactivated. *See* Dissent at 3 n.2. *Weidner* shows, however, that a defendant can falsify a record by intentionally causing it to be created in an incomplete fashion in advance of conduct that the defendant intends to engage in and wishes to conceal. There is no indication in *Weidner* that the defendants omitted any material information about past events from their loan proposal; rather, they omitted only information about how they intended to use the loan in the future. *See Weidner*, 437 F.3d at 1038–40. Nevertheless, we upheld their convictions under § 1005 for making a false entry in a bank record, reasoning that they omitted this information about their future intentions from the loan proposal in an effort to mislead anyone who reviewed the loan proposal later. *See id.*

Likewise, Mr. Smith attempted to ensure that the records he was creating, when referred to in the future, would paint a misleading picture of the events documented in these official records. Like the defendants in *Weidner*, he caused the

records not to document the conduct he intended to engage in because he wanted to conceal this anticipated conduct from anyone who reviewed the records later. He thus knowingly prevented material information about the traffic stop from appearing in the official records of the stop, just as the defendants in *Weidner* knowingly prevented material information about their anticipated side dealings from appearing in the loan proposal and just as the defendants in *Underwood*, *Moyer*, *Lanham*, and *Schmeltz* knowingly prevented material information regarding various law enforcement incidents from appearing in their official reports of these incidents.

We see no reason for treating the pre-misconduct falsification of records at issue in this case and in *Weidner* differently than the post-misconduct falsification that occurred in *Underwood*, *Moyer*, *Lanham*, and *Schmeltz*. In either scenario, an individual falsifies a record by creating an official record that is intended to convey a false impression of the situation through the individual's knowing creation of an intentionally incomplete record. We thus conclude, consistently with our decision in *Weidner*, that a defendant can falsify a record by preventing the documentation of information about current or future conduct in the record as well as by preventing the documentation of events that already occurred before the record was created.[10] Accordingly, we hold that a police officer's knowing deactivation of his recording

---

[10] Although the specific charge at issue in *Weidner* was slightly different—involving making a false entry in a record, rather than altering or falsifying a record—nothing in our opinion in *Weidner* suggested that "making a false entry" is unique in including within its scope the failure to document material future-looking information from a record as a means of creating a misleadingly incomplete record.

41

devices with the intent to prevent the disclosure of the truth constitutes a falsification

of the records created by those devices, even if the records never existed in a

complete format because of the officer's actions. We are persuaded by *Weidner* and

relevant decisions from our sister circuits that § 1519 does not require proof that

Mr. Smith physically removed or destroyed existing footage from the recordings of

the traffic stop. Rather, we hold that § 1519 can be satisfied through evidence that

Mr. Smith created a record from which he knowingly excluded pertinent information

to convey a false representation of the actual encounter with the intent to impede,

obstruct, or influence an investigation.[11]

   And the evidence introduced at trial supports the conclusion that he did just

that. He created official records of the traffic stop by activating his dashcam and

---

[11] For purposes of § 1519, the investigation must involve "any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11," 18 U.S.C. § 1519, but the defendant does not need to act with the specific intent to impede, obstruct, or influence a federal investigation. "[I]t is well settled that mens rea requirements typically do not extend to the jurisdictional elements of a crime." *Moyer*, 674 F.3d at 208 (quoting *United States v. Cooper*, 482 F.3d 658, 664 (4th Cir. 2007)). The Government therefore did not need to prove that Mr. Smith knew the recordings of his encounter with K.H. would implicate a matter within the jurisdiction of the federal government. Instead, the Government needed to prove only that he knowingly altered, destroyed, mutilated, concealed, covered up, falsified, or made a false entry in a record with the intent to impede, obstruct, or influence any potential investigation related to the traffic stop and, separately, that the jurisdictional element was met. *See id.* at 208–09; *see also United States v. Smith*, 413 F.3d 1253, 1275 (10th Cir. 2005) ("[K]nowledge of such jurisdictional facts is not generally an element of the required intent under federal statutes." (quotation marks omitted)). It is therefore irrelevant whether Mr. Smith knew of the potential federal nature of any future investigation that might flow from the traffic stop.

bodycam, then he knowingly and misleadingly excluded pertinent information from these records by affirmatively turning off his cameras while the stop was still ongoing. In so doing, he ensured that key information about his interactions with J.G. and K.H. would be omitted from the official records of the stop. A reasonable jury could find that this conduct constituted a knowing alteration or falsification of "any record, document, or tangible object," 18 U.S.C. § 1519, just like it would have been a knowing alteration or falsification of "any record," *id.*, if Mr. Smith had written a police report from which he knowingly omitted key details about the traffic stop. *See, e.g.*, *Moyer*, 674 F.3d at 207–08. And a reasonable jury could further infer that Mr. Smith falsified the recordings of the traffic stop with the intent to impede, obstruct, or influence an investigation into his sexual assault of K.H.[12]

Contrary to Mr. Smith's argument, this interpretation of § 1519 does not criminalize "passive behavior such as failing to record criminal conduct." Reply Br. at 9. Mr. Smith did not violate § 1519 by passively failing to record his criminal conduct. Rather, he violated § 1519 by affirmatively deactivating the cameras that

---

[12] Mr. Smith does not dispute that the intent element of the offense was satisfied, except insofar as he incorrectly suggests that the Government was required to establish that he acted with the specific intent to impede a federal investigation. And the jury heard ample evidence from which it could reasonably infer both that Mr. Smith acted with the requisite intent to impede, obstruct, or influence an investigation and that this investigation implicated federal jurisdiction. *See* 18 U.S.C. § 1519. Among other evidence, the jury heard testimony that Mr. Smith's training officer specifically warned him on two different occasions about a former SPD officer who had been investigated and convicted for sexual misconduct. The jury could reasonably infer that Mr. Smith deactivated his cameras in an attempt to avoid a similar fate. And Mr. Smith does not dispute that his sexual assault of K.H. under color of law implicated federal jurisdiction.

43

were already creating records of the traffic stop as a means of altering and falsifying these records. Indeed, physically accessing and deactivating recording devices to alter and falsify the records created by these devices involves more affirmative conduct than failing to include material information in a loan proposal, yet we found the latter conduct to be sufficient to sustain a conviction for falsifying bank records under § 1005. *See Weidner*, 437 F.3d at 1037–40.

Of course, § 1519 does not impose an affirmative, freestanding duty on individuals to film their criminal conduct, just as § 1005 does not impose an affirmative duty on individuals to prepare loan documents. But when an individual is creating an official record that purports to convey a true picture of a situation— whether it be dashcam footage of a traffic stop, a police report about an arrest, or a loan proposal prepared by a bank official—then the individual can be found liable for falsifying this record if the individual knowingly creates the record in an incomplete form with the intent to convey a false representation of the facts. *See id.*; *Underwood*, 95 F.4th at 889; *Moyer*, 674 F.3d at 207–08; *Lanham*, 617 F.3d at 887; *Schmeltz*, 667 F.3d at 688; *Rowland*, 826 F.3d at 107–08.

In sum, a reasonable jury could find that Mr. Smith violated § 1519 by knowingly deactivating his bodycam and dashcam so the official records he was creating of the traffic stop would not include material information about the stop. A reasonable jury could find that Mr. Smith thereby knowingly altered and falsified the records of the stop, and that he did so with the intent to impede, obstruct, or influence any investigation into the sexual assault that occurred during the stop. We therefore

44

affirm the district court's denial of Mr. Smith's motions to dismiss the indictment and for a judgment of acquittal.

### C.    Substantive Reasonableness of Sentence

"When reviewing the substantive reasonableness of a sentence, we give substantial deference to the district court and will only overturn a sentence that is arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Budder*, 76 F.4th 1007, 1016 (10th Cir. 2023) (internal quotation marks omitted). "As a general matter, it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence." *Id.* (quoting *Concepcion v. United States*, 597 U.S. 481, 501 (2022)). "We do not reweigh" the district court's evaluation of the 18 U.S.C. § 3553(a) sentencing factors; instead, we simply "ask whether the sentence fell within the range of rationally available choices that facts and the law at issue can fairly support." *United States v. Blair*, 933 F.3d 1271, 1274 (10th Cir. 2019) (internal quotation marks omitted). "Thus, as long as the balance struck by the district court among the factors set out in § 3553(a) is not arbitrary, capricious, or manifestly unreasonable, we must defer to that decision even if we would not have struck the same balance in the first instance." *United States v. Sells*, 541 F.3d 1227, 1239 (10th Cir. 2008).

Mr. Smith contends that his sentence is not substantively reasonable because a ten-year sentence would have been adequate to satisfy the § 3553(a) factors. But his argument on this point amounts to a request for us to reweigh the district court's balancing of these factors, which is "something we cannot and will not do." *Budder*,

76 F.4th at 1017; *see also Blair*, 933 F.3d at 1274; *United States v. Lawless*, 979 F.3d 849, 856 (10th Cir. 2020) ("Mr. Lawless invites us to reweigh the district court's balancing of the § 3553(a) factors including the severity of his offense, mitigating circumstances, need for deterrence, need to protect the public, and need to avoid unwarranted sentence disparities. We decline that invitation because reweighing the factors is beyond the ambit of our review."). Mr. Smith's disagreement with the district court's balancing of the § 3553(a) factors does not establish an abuse of discretion, and we therefore reject this argument.

Mr. Smith further argues that his sentence is substantively unreasonable because it is longer than the statutory maximum for assaulting a federal officer. But Congress's decision to establish a different statutory maximum for a different offense does not prove that the district court abused its discretion by sentencing Mr. Smith to a sentence within the permissible range for his crime. A sentencing court is not required "to consider disparities between individuals found guilty of different crimes," *United States v. Clark*, 201 F. App'x 594, 596–97 (10th Cir. 2006) (unpublished),[13] and Mr. Smith provides no evidence or argument to show that he was treated differently than similarly situated offenders who engaged in the same criminal conduct. *See United States v. Davis*, 437 F.3d 989, 997 (10th Cir. 2006).

---

[13] We cite unpublished cases for their persuasive value only and do not treat them as binding authority. *See United States v. Ellis*, 23 F.4th 1228, 1238 n.6 (10th Cir. 2022).

Moreover, it is worth emphasizing that Mr. Smith received a 480-month sentence only on Count 1 of the indictment, which charged him with violating 18 U.S.C. §§ 242 and 250(b)(3) by abusing his power as a police officer to sexually assault a vulnerable victim. As the Supreme Court has noted, "[p]ublic officials convicted of violating § 242 have done more than engage in serious criminal conduct; they have done so under color of the law they have sworn to uphold." *Koon v. United States*, 518 U.S. 81, 110 (1996). And because of the "particularly serious" nature of this abuse of official power, *United States v. McQueen*, 727 F.3d 1144, 1157 (11th Cir. 2013), the "commi[ssion of] a crime while acting under color of law will [often] result in a higher sentence—as it did in this case—rather than a lower sentence," *United States v. LaVallee*, 439 F.3d 670, 708 (10th Cir. 2006).

In sum, Mr. Smith has not shown that his 480-month sentence falls outside "the range of rationally available choices that facts and the law at issue can fairly support," *Blair*, 933 F.3d at 1274 (internal quotation marks omitted). We therefore reject his challenge to the substantive reasonableness of his sentence.

## III.    CONCLUSION

For the reasons discussed above, we AFFIRM Mr. Smith's conviction and sentence.

47

No. 25-7019, *United States v. Smith*
**PHILLIPS**, Circuit Judge, concurring and dissenting.

I join the majority in affirming the district court's denial of the motion

for continuance as well as the substantive reasonableness of the sentence

imposed. But I disagree with the majority's interpretation and application of

18 U.S.C. § 1519. I would reverse Mr. Smith's convictions for Counts Two and

Three and remand for resentencing.[1]

I start with the statute:

Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

18 U.S.C. § 1519. The government indicted Officer Smith for having

"knowingly altered, concealed, covered up, and falsified an SPD [Savanna

police department] record by deactivating his SPD body worn camera during

the traffic stop [Count Two]" and "by deactivating his SPD dashboard camera

during the traffic stop [Count Three]."

As I see it, a "record" of a video-audio recording is the entire recording

made but nothing beyond that. Both of Officer Smith's traffic-stop recordings

ran uninterrupted until he switched off the recorders. He didn't alter the

---

[1] For Jeffrey Smith's conduct while he was an officer, I refer to him as Officer Smith, and for events after his termination, I refer to him as Mr. Smith.

1

recordings before turning them in at the end of his shift. So by my take, Smith didn't violate § 1519.

My view contrasts with the majority's position on what a § 1519 "record" is. As the majority sees it, Officer Smith "manipulate[d] the contents of these recordings by manually deactivating both of his cameras before he began his sexual assault of K.H." Maj. Op. at 31. I don't think that the video-audio "record" can expand past what was recorded. It matters not why the recordings ended. A person can't alter, destroy, mutilate, cover up, falsify, or make a false entry in something that never existed.

Though Officer Smith's deactivating the recordings before he sexually assaulted K.H. was inculpatory and perhaps even criminal under other federal statutes, he didn't violate § 1519. In deciding otherwise, the majority relies on cases that it says present "an analogous situation where a law enforcement officer knowingly omits information from an official report with the intent to obstruct, impede, or influence an investigation." Maj. Op. at 32. But for me those cases differ fundamentally from Mr. Smith's in important ways.

First, as mentioned, Officer Smith omitted nothing from the video-audio recordings themselves. In contrast, the officers in the police-report cases did omit material details they knew about before issuing the reports. Second, someone reviewing Officer Smith's video-audio recordings would instantly realize that he stopped the recordings to avoid capturing the sexual assault. But someone reading a police report containing lies and material omissions would

lack an equally suspicious indicator. That's because a reader would expect that all material investigative facts up to the date of the report would be included in it.

The majority offers two police-report cases involving § 1519 convictions against officers who embedded lies in their reports and omitted material truths. *See United States v. Underwood*, 95 F.4th 877, 899–90 (4th Cir. 2024); *United States v. Moyer*, 674 F.3d 192, 207–08 (3d Cir. 2012). It cites a third case involving a § 1519 conviction against an officer who omitted material information from his report. *United States v. Schmeltz*, 667 F.3d 685, 686–87 (6th Cir. 2011). For these police-report cases to be analogous to Officer Smith's traffic-stop-recordings case, the police reports would have to say that they contained material information up to a certain instant but omitted mention of all other information occurring after that instant.[2] None of the reports in the majority's cases fit that bill. So the majority extends § 1519 beyond its application in the above three cases.

Finally, I have doubts that "falsifies . . . any record [or] document" even applies in Mr. Smith's case. I read that language as applying when a defendant knowingly creates or uses a document as actual and legitimate when it is not.

---

[2]According to *Moyer*, "'[r]ecord' is defined as 'anything preserving information and constituting a piece of evidence *about past events*.'" 674 F.3d at 205 (emphasis added) (citing Oxford English Dictionary (3d ed. 2009)). As I understand it, the majority includes unrecorded *future* events as part of the "record, document, or tangible object."

3

An actual police report from an actual police department containing lies and material omissions is better housed with § 1519's criminalizing of "mak[ing] a false entry in any record [or] document."